[No. 34014-3-II. Division Two. August 28, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT EDWARD LEWIS, *Appellant*.

372

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Michelle Hyer, Deputy*, for respondent.

¶1 HUNT, J. — Defendant Robert Lewis appeals his second degree murder conviction. The trial court originally found Lewis incompetent to stand trial. After a 90-day commitment at Western State Hospital (WSH) under RCW 10.77.090, the trial court found that his competency had been restored.

¶2 Lewis assigns error to the trial court's (1) finding him competent, because the State failed to test him for a developmental disability; (2) exclusion of expert testimony about the potential effects of methamphetamine on behavior in general; (3) failure to grant a mistrial; (4) failure to

give a justifiable homicide jury instruction;[1] and (5) finding of fact that he had previous convictions for "most serious" offenses, contrary to *Blakely v. Washington*.[2] Lewis also argues that the State engaged in prosecutorial misconduct during closing argument and violated his CrR 3.3 speedy trial rights.[3]

¶3 Finding no reversible error, we affirm.

## FACTS

### I. Murder

¶4 In July 2002, Robert Lewis drove to the residence of his friend Frank Hieber, where he overheard a phone conversation between Hieber's girl friend and Brett Holdorph about a drug transaction dispute. Because Holdorph also owed Lewis money, Lewis volunteered to drive Hieber to Holdorph's residence to retrieve the missing money or drugs. Hieber stayed in the car while Lewis entered Holdorph's home, shot Brett Holdorph in the presence of his mother, Francis Holdorph, and ran back to the car. Hieber drove to Lewis's brother's home, while Lewis exclaimed, "F*ck, Frank, F*ck." Report of Proceedings (RP) (Sept. 29, 2005) at 376. At his brother's home, Lewis changed out of his red sweatshirt, removed the spoiler from the rear of his car, and covered the car with a tarp, leaving it hidden at his brother's for nearly two months.

¶5 More than a year later, a "Crime Stoppers" tip led police to stop Lewis's vehicle. A Fircrest police officer ran Lewis's name through the LESA[4] computer system and arrested him. The State charged Lewis with murdering Holdorph in the first degree.

---

[1] Statement of Additional Grounds (SAG). RAP 10.10.

[2] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[3] SAG.

[4] "LESA" stands for "Law Enforcement Support Agency."

II. Procedure

A. Competency Hearing

¶6  On January 21, 2004, the trial court granted defense counsel's motion to send Lewis to WSH for a 15-day competency evaluation. Following a June 2, 2004 hearing, the trial court ordered Lewis committed for 90 days to restore his competency, under RCW 10.77.090.

¶7  In December 2004, the trial court held a hearing to determine if Lewis had regained his competency to stand trial. Two expert State witnesses testified that Lewis was capable of understanding the charges against him and assisting defense counsel. The State relied primarily on the testimony of Dr. Ronald Murray Hart, who had authored two reports for the trial court, evaluated Lewis, and observed Lewis on the WSH ward. Lewis had reported to Dr. Hart that he had frequently abused drugs such as marijuana and LSD when he was younger, that he suffered from hallucinations, and that he had a chip in his head that allowed others to read his thoughts.

¶8  Dr. Hart found Lewis uncooperative during his evaluations and opined that Lewis embellished many of his symptoms. For example, when alone with Dr. Hart, Lewis would state that he could not remember such basic information as his mother's name; he would exhibit difficulties when trying to perform basic mathematics; and he would often stutter, complain of hallucinations, and act very impaired. But Dr. Hart observed that, when interacting with other patients, out of sight of the doctors, Lewis spoke normally and was able to play card games correctly, to keep score during dominoes, to remember telephone numbers, and to recall the address of his high school. Similarly, an occupational therapist noted such inconsistencies as Lewis's ability to recall precise details of his previous incarcerations and his professed inability to remember his mother's name.

¶9 The State also presented testimony from Dr. Brian Waiblinger, a forensic psychologist from WSH, who concurred with Dr. Hart's assessment that Lewis exaggerated his symptoms. Dr. Waiblinger had observed the same gross inconsistencies between Lewis's behavior during interviews with WSH staff and his behavior on the ward with other patients.

¶10 Neither Dr. Hart nor Dr. Waiblinger actually tested Lewis's IQ (intelligence quotient), but both agreed it was over 70, which is above the range for mental retardation. Both experts opined that Lewis did not suffer from a mental disease or defect that would interfere with his competency, and both believed he possessed the capacity to assist his attorney during trial.

¶11 Lewis relied on his appointed expert witness, Dr. Vincent Thomas Gollogly, former clinical director at the McNeil Island Special Commitment Center, who opined that Lewis remained incompetent. Dr. Gollogly (1) reviewed the WSH reports; (2) met with Lewis three times in the Pierce County jail; (3) shared the State's experts' concerns that Lewis was malingering or exaggerating his symptoms; (4) concluded that Lewis had a mental disease or defect making him incompetent to stand trial; and (5) noted that Lewis's low IQ (70-75), in addition to other deficits, could result in his being developmentally disabled, for which a developmental disability expert would need to conduct an evaluation.

¶12 After the three doctors testified, Lewis argued that (1) RCW 10.77.090[5] required the State to evaluate him for developmental disabilities during his 90-day commitment; (2) there was no evidence that WSH had evaluated whether he was developmentally disabled; and (3) thus, the State had failed to comply with the statute. Lewis did not, however, argue that a finding of developmental disability would have triggered a finding of incompetency.

---

[5] "[A] defendant found incompetent shall be evaluated ... and a determination made whether the defendant is developmentally disabled." RCW 10.77.090(1)(c).

¶13  The State recalled Dr. Hart, who (1) explained that WSH did not test Lewis for any developmental disability because it was clear that he did not suffer from a developmental disability; (2) acknowledged that he did not administer a formal IQ test to Lewis; (3) noted that Lewis's IQ placed him beyond the range of mental retardation, based on Dr. Hart's observations of Lewis in the ward and his social interaction with his peers; (4) confirmed that these observational criteria would be generally accepted in the field of psychology to determine whether a person suffered from a developmental disability; and (5) noted that nothing in Lewis's medical history or school records mentioned any sign of a developmental disability.[6]

¶14  The trial court ruled that the developmental disability question was a threshold issue; Dr. Hart's testimony established that Lewis did not meet the clinical definition of "developmentally disabled"; and, therefore, the State did not need to engage in further developmental disability testing. The trial court then found, by a preponderance of the evidence, that Lewis was competent to stand trial because he understood the nature of the charges and he was capable of assisting defense counsel. In its findings of fact, the trial court noted Lewis's appropriate communication skills, strong memory, ability to express his needs, and understanding of the legal charges against him and his possible defenses.

## B. Trial

¶15  Trial started on September 26, 2005. During pretrial motions in limine, both the State and Lewis agreed that there would be no references to Lewis's prior convictions.

### 1. Testimony

¶16  At trial, the victim's mother, Francis Holdorph, testified that she had been in the kitchen, preparing coffee,

---

[6] RCW 71A.10.020(3) defines a "developmental disability" as one that originates before the individual turns 18.

when she heard the doorbell ring. She looked out the front door peephole, saw the top of someone's head, and opened the door to find Lewis standing outside asking whether her son, Brett Holdorph, was at home. When she explained that Brett was sleeping, Lewis immediately pushed open the door, grabbed her by the hair, and demanded that she call for Brett. When Mrs. Holdorph summoned Brett from his bedroom, he stepped out into the hall, naked except for a towel wrapped around his waist. Lewis immediately pulled out a gun, shot Brett Holdorph once through the chest, ran out of the house, and drove away. Holdorph told his mother to call 911, but he died soon after. Mrs. Holdorph testified that Brett never attacked Lewis and that the two men never struggled.

¶17 The State's remaining witnesses corroborated that Lewis was the shooter, that his interaction with Brett Holdorph stemmed from previous drug transactions, and that Lewis had sought out Holdorph because of a disagreement over a drug transaction between Holdorph and Hieber's girl friend. In addition, Lewis's brother testified that Lewis had admitted having accidentally shot Brett Holdorph.

¶18 Lay and police witnesses and a medical examiner described Holdorph's gunshot wound. The medical examiner definitively opined that the cause of death was a homicide resulting from the fatal gunshot.

### 2. Excluded expert opinion on effects of methamphetamine

¶19 Defense counsel elicited that the toxicology report noted that Holdorph's blood contained a high level of methamphetamine at the time of his death. The medical examiner confirmed this information. Defense counsel then asked the medical examiner for his expert opinion on whether methamphetamine can cause a person to act aggressively.

¶20 Outside the jury's presence, the medical examiner testified that methamphetamine can cause some users to

experience paranoia, irritability, or "irrational behavior," and that some can become violent. The medical examiner qualified this statement, however, by noting that methamphetamine affects different people differently and that some people build up a tolerance for methamphetamine such that not even a high level necessarily produces such changes in behavior. The medical examiner explained that he had no knowledge or opinion about how the high level of methamphetamine affected Holdorph.

¶21 The State objected to admission of this testimony on relevancy grounds, arguing that there was no evidence about how methamphetamine affected Holdorph specifically and, therefore, the testimony was likely to mislead the jury. Lewis countered that the information was vital to his defense because it corroborated the notion that Holdorph was the aggressor and that Lewis had fired the gun at Holdorph in self-defense. The trial court excluded the evidence, reasoning that methamphetamine's effects on some users was irrelevant and speculative as to its effect on Lewis, the evidence could mislead the jury, and its exclusion did not prevent Lewis from arguing his theory of the case.

### 3. Defense testimony

¶22 Lewis testified in his own defense. He admitted having gone to Brett Holdorph's home but claimed he had sought out Holdorph to retrieve drugs for Hieber and his girl friend. Lewis further testified that (1) Hieber had provided him with the weapon, warning that Holdorph could act irrationally; (2) he (Lewis) had entered Brett Holdorph's home with Mrs. Holdorph's permission; (3) on seeing Lewis in the hallway, Holdorph charged and attacked him (Lewis); (4) during the struggle, Lewis attempted to put Mrs. Holdorph between himself and Brett Holdorph, but this did not stop Brett Holdorph's aggression; (5) Lewis then pulled out the gun, he and Brett Holdorph struggled over it, and the gun went off accidentally; and (6) out of fear, Lewis then ran from the house.

## C. Sentencing

¶23 The jury convicted Lewis of second degree murder. At sentencing, the State argued that the trial court must sentence Lewis under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570, because Lewis had a 1994 conviction for assault in the second degree (Pierce County Superior Court cause No. 94-1-00343-9) and a 1995 conviction for kidnapping (Pierce County Superior Court cause No. 95-1-01917-1). The original judgment and sentence for the assault conviction contained the name "Robert Edward Lewis"; the kidnapping conviction contained the name "Robert Lewis."

¶24 The State called forensic specialist Steven Wilkins, who testified that he had (1) compared Lewis's fingerprints to a "certified Xerox copy" of all four fingers on the fingerprint cards attached to the original judgment and sentences for Lewis's two prior convictions and (2) concluded that Lewis's fingerprints matched the fingerprints on cause Nos. 94-1-00343-9 and 95-1-01917-1. On cross-examination, Wilkins conceded he did not recall how many points of similarity he had found between the fingerprints.

¶25 Defense counsel argued that there was insufficient certification of Lewis's prior assault conviction. He also challenged the sufficiency of the identity evidence, arguing that "being identical in name alone is not enough."

¶26 The sentencing court noted that the judgment and sentences all contain the same birthday and the same Social Security number. It then ruled that the information on the documents, in conjunction with Wilkins's testimony, established that the previous convictions were Lewis's. The court sentenced Lewis to life in prison without the possibility of release under the POAA. RCW 9.94A.570.

¶27 Lewis appeals his conviction and his POAA sentence.

## ANALYSIS

### I. COMPETENCY

¶28 Lewis argues that the trial court erroneously found him competent to stand trial because no developmental disability expert had tested him.[7] This argument fails.

#### A. Standard of Review

¶29 Both the due process clause of the United States Constitution and RCW 10.77.050 forbid trying an incompetent criminal defendant. *Pate v. Robinson*, 383 U.S. 375, 386, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 861, 16 P.3d 610 (2001). In Washington, a defendant is competent to stand trial if he understands the nature of the charges and is capable of assisting in his own defense. *See State v. Hahn*, 106 Wn.2d 885, 894, 726 P.2d 25 (1986). On appeal, we do not reverse a trial court's competency determination absent a manifest abuse of discretion. *State v. Crenshaw*, 27 Wn. App. 326, 330, 617 P.2d 1041 (1980).

#### B. Determination

¶30 Defense counsel initially raised questions about Lewis's competency, triggering the trial court's decision to commit Lewis for a 15-day competency evaluation under RCW 10.77.060. RCW 10.77.060(1)(a) requires one of the competency-evaluating professionals to be a developmental disabilities professional only *"if the court is advised by any party that the defendant may be developmentally disabled."* (Emphasis added.) Here, however, no one, including defense counsel and Lewis himself, advised the trial court of

---

[7] Lewis appears to base this argument on chapter 10.77 RCW provisions that require a developmental disability expert to evaluate a defendant in certain circumstances. *See, e.g.*, RCW 10.77.120, .060. These triggering circumstances, however, are not present here.

any concerns that Lewis might have developmental disabilities.[8] Moreover, during Lewis's initial evaluation, none of the examining professionals noticed any reason to find Lewis developmentally disabled.

¶31 When Lewis returned from his initial 15-day evaluation, the trial court found him incompetent to proceed to trial and committed him for 90 days under RCW 10.77.090. Thereafter, Dr. Hart testified, in his expert opinion, to a reasonable degree of psychological certainty, that Lewis did not suffer from a developmental disability. Dr. Hart based this assessment on Lewis's estimated IQ, his behavior on the hospital ward, and the lack of any reference to a developmental disability in Lewis's medical and school records. Lewis argues that Dr. Hart's opinion is insufficient to establish the absence of a developmental disability because Dr. Hart is not a disability expert, he did not perform an IQ test, and, instead, he merely estimated Lewis's IQ.

### 1. Statutory construction

¶32 Construction of a statute is a question of law, which we review de novo under the error of law standard. *City of Pasco v. Pub. Employment Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992); *Inland Empire Distrib. Sys., Inc. v. Utils. & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624 (1989). The courts retain the ultimate authority to interpret a statute. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325-26, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983). Our obligation is to give effect to the intent of the legislature.

¶33 Our review begins with the plain language of the statute. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). RCW 10.77.090(1)(c) provides that "[a] defendant found incompetent shall be

---

[8] The form order for a 15-day evaluation includes a blank box that the trial court can mark if either party has raised the issue of developmental disability. The box on Lewis's order remains blank.

evaluated . . . and a determination made whether the defendant is developmentally disabled."[9] But unlike RCW 10.77.060(1)(a), which expressly requires evaluation by a "developmental disabilities professional,"[10] RCW 10.77-.090(1)(c) does not specify who must perform the developmental disability evaluation or how the evaluation should be conducted. Nor does RCW 10.77.090(1)(c) require the trial court to make a specific finding about the presence or absence of a developmental disability in connection with determining a defendant's competency to stand trial. Furthermore, none of the three experts, not even Lewis's, opined that Lewis was developmentally disabled. Although no one performed a formal IQ test, all three experts, including Lewis's, placed his IQ above 70 and, thus, outside the IQ range for mental retardation.

¶34 Moreover, Lewis does not attempt to explain how a finding of developmental disability, even if warranted, would have affected the trial court's eventual decision finding him competent to stand trial. As noted above, the test for competency in Washington is whether a defendant (1) understands the nature of the charges and (2) is capable of rationally assisting his defense attorney. *Hahn*, 106 Wn.2d at 894. The record shows that even if Lewis had been developmentally disabled, he still would have met these competency requirements. *See, e.g.*, *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986) (finding developmentally delayed defendant with IQ of 49-59 competent to stand trial); *State v. Minnix*,

---

[9] RCW 71A.10.020(3) defines "developmental disability" as:

a disability attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, which disability originates before the individual attains age eighteen, which has continued or can be expected to continue indefinitely, and which constitutes a substantial handicap to the individual.

[10] *See, e.g.*, RCW 10.77.120 ("examinations of all developmentally disabled persons . . . shall be performed by developmental disabilities professionals"); RCW 10.77.060(1)(a) ("one of the experts or professional persons appointed shall be a developmental disabilities professional"). RCW 10.77.090 lacks a similar requirement.

63 Wn. App. 494, 498-99, 820 P.2d 956 (1991) (mildly retarded defendant with IQ between 49 and 67 was competent to stand trial when he understood the nature of the charges, the role of the judge, and the consequences of his behavior).

¶35 We hold, therefore, that (1) the plain language of RCW 10.77.090 does not require a developmental disability expert to evaluate a criminal defendant under a 90-day commitment order to restore competency and (2) Dr. Hart's evaluation, that Lewis did not suffer from a developmental disability, satisfied the developmental-disability-evaluation requirement of RCW 10.77.090(1)(c).

## 2. Evidentiary support

¶36 Lewis assigns error to the trial court's competency determination, arguing that the trial court did not force the State to comply with RCW 10.77.090. But he does not assign error to the trial court's findings of fact. Therefore, we treat as verities on appeal the following unchallenged findings[11] about Lewis's abilities: that Lewis was able (1) to communicate and to interact normally with other patients at WSH; (2) to play and to keep score accurately during board and card games with others; (3) to memorize phone numbers; (4) to maintain his daily hygiene; (5) to express his needs to others by correctly filling out commissary slips and rationally discussing his medication; and (6) to recall accurately memories from high school and his previous incarcerations.

¶37 The trial court also found that Lewis was able to articulate the charges he faced as well as the reasons behind those charges and the importance of a qualified defense attorney and a sound criminal defense. *See Minnix*, 63 Wn. App. at 498-99. Thus, even if there had been some evidence of developmental disability, these unchallenged observations and findings amply support the trial court's

---

[11] *State v. Wilson*, 136 Wn. App. 596, 605, 150 P.3d 144 (2007).

determination that Lewis had become competent before trial began.

## II. Exclusion of Speculative Expert Testimony

¶38 Lewis next argues that the trial court committed reversible error when it excluded, as speculative and irrelevant, testimony about the possible effects of methamphetamine on human behavior in general. This argument also fails.

### A. Standard of Review

¶39 Admission of evidence is within the trial court's sound discretion. We will not reverse absent a showing of an abuse of that discretion, even if we might have allowed the proffered evidence had we been in the trial court's position. *See State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306, *review denied*, 108 Wn.2d 1033 (1987).

¶40 Washington courts have repeatedly followed an abuse of discretion standard, even when a defendant seeks to exercise his constitutional right to present evidence in his own defense by offering expert testimony. The Washington Supreme Court's opinion in *State v. Cheatam*, for example, illustrates that trial courts frequently determine the admissibility of expert testimony and that appellate courts review their decisions for abuse of discretion. 150 Wn.2d 626, 645, 81 P.3d 830 (2003); *see also State v. Smissaert*, 41 Wn. App. 813, 814, 706 P.2d 647 (1985) (no abuse of discretion in excluding expert testimony on the effect of alcohol on defendant's behavior).

¶41 In *Cheatam*, the State relied mainly on a rape victim's testimony and identification. The trial court excluded the defendant's expert testimony about the unreliability of eyewitness identification. *Cheatam*, 150 Wn.2d at 644. The defendant's expert would have testified about the difficulties of cross-racial identifications and the effects of stress and violence, weapon focus, and lighting on

witnesses' perceptions and memories. *Id.* at 644. The *Cheatam* court noted that a defendant has a constitutional right to present a defense and that expert testimony on the fallibility of eyewitness identification is admissible in certain cases; nonetheless, the court concluded that "whether the expert testimony proffered here was both relevant and helpful is *debatable* and, therefore, [we] hold that the trial court's decision not to admit [the expert witness's] testimony *under the facts of this case was a tenable exercise of discretion.*" *Id.* at 652 (emphasis added).

¶42 Abuse of discretion occurs when the trial court's discretion is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). We hold that Lewis has not met this high standard here.

### B. Admissibility

¶43 Dr. Roberto Ramos, the medical examiner, testified about the high level of methamphetamine in Brett Holdorph's body at the time Lewis shot him. Outside the presence of the jury, Lewis elicited from the medical examiner the "general effects" of high levels of methamphetamine in some people—that they can cause aggressive and irrational behavior, depending on the individual's tolerance level for the drug.[12] Dr. Ramos had no opinion, however, on what specific effect the 2.71 milligrams per liter of methamphetamine and amphetamine in Holdorph's body

---

[12] More specifically, Dr. Ramos explained:

As I said, chemicals are a drug, have so many effects on people, but you're going to say this effect will happen in a specific individual. That's so much variation, and people can develop tolerance on these drugs and may not have any effect, too. That's possible, too.

In giving that, I mean counsel asked me what all the effects of it and physiologically these are the effects mentioned to learn from this drugs [sic], but I know that it doesn't produce the same effect on individuals—in the same individual or different individuals, so I don't know if that helps in your decision, and I cannot say that this individual have this behavior or have this effect on this particular person.

RP at 259-60.

might have had on his behavior right before Lewis shot him.

¶44 Lewis made the following offer of proof about how Dr. Ramos would testify if allowed:

VOIR DIRE BY [Defendant's Counsel]:

Q. Dr. Ramoso [sic], from the amount of methamphetamine, and amphetamine, the milligrams per liter in the blood, can you tell me how much would had to have been consumed?

A. I don't think I can tell you exactly. If you can say that there's only one time the drug was taken, the problem with this is maybe I can talk—the numbers aren't really that important especially with methamphetamine and amphetamine. You have to put all the circumstances in this one. That number may not have any effect on some individual or it could be lethal to some individual. You're going to play with numbers on methamphetamine. Some people develop tolerance on [sic] different individuals and they can take hundreds of doses of methamphetamine and they're fine because of the tolerance that they develop. So that's why it's very difficult to say, but this is a fairly high level of methamphetamine, and I said it could be lethal to some people at this level, but there are some people that I have seen driving with 18 milligrams of methamphetamine too. So this is the problem with this drug; the numbers are not that important. You can tell that there's a lot of methamphetamine in there, but the tolerance of the individual is so important that the effect you cannot really tell on the individual involved. . . . There's a lot of methamphetamine in here. The problem with telling how much was taken is that the methamphetamine is taken. It has a long half life. It takes about 12 hours half life. And if you take methamphetamine every four hours or every six hours, it kind of accumulates and accumulates in the blood, can go up that high without taking such big dose at one time. That's the problem of telling how much this person may have taken, how much amphetamine was taken, because they could have been taking it sequentially within a number of hours. Since it's not eliminating quite fast enough in the body, it can accumulate. But that's a

significant amount of methamphetamine. Just to show you, usually a ten milligram dose will usually only go to .02 and this is 2. But, again, this can accumulate in the body if you're taking it more often which it should be taken at least every 12 hours half life so it takes 24 hours before it really gets eliminated.

RP at 269-71.

¶45 Lewis sought to admit this testimony, reasoning that it bore directly on his theory of the case that Holdorph was the aggressor and his (Lewis's) shooting Holdorph was either accidental or in self-defense. The trial court excluded the testimony, (1) ruling it irrelevant and speculative because the medical examiner was unable to opine about the methamphetamine's effect on Holdorph specifically and (2) noting that such exclusion would not hinder Lewis's presentation of his defense.[13]

¶46 Moreover, as the State explained to the trial court, at that point in the trial, Lewis had said nothing in his opening statement about a defense theory that Holdorph was high on methamphetamine such that it caused him to charge toward Lewis, thus provoking Lewis's shooting in self-defense. Nor had Lewis presented any testimony to support such a theory.[14]

¶47 Under ER 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Dr. Ramos's proffered testimony does not meet this test. As Lewis acknowledged when the trial court pressed him for relevance and specificity, "Your Honor, I can cut to the chase

---

[13] The court stated, "[T]he defense will still be able to put forward its theory of the case" without Dr. Ramos "speculating" with respect to the effects of methamphetamine.

[14] Except in the context of arguing about the propriety of instructing the jury on justifiable homicide, the parties' briefs do not address the related issue of whether Lewis would even have been entitled to assert self-defense when it was he who forced his way into the Holdorphs' home and confronted Holdorph, who was nearly naked and clearly unarmed.

because the follow-up question is, Dr. Ramoso [sic], you cannot tell us whether or not this methamphetamine caused [Holdorph] to act violently, can you?" To which Dr. Ramos responded, "No, I can't." RP at 257.

¶48 Such speculative testimony is not rendered less speculative or of more consequence to the jury's determination simply because it comes from an expert. Expert testimony is admissible under ER 702 if (1) the witness qualifies as an expert and (2) the expert's testimony would be helpful to the trier of fact. *State v. Baird*, 83 Wn. App. 477, 484-85, 922 P.2d 157 (1996), *review denied*, 131 Wn.2d 1012 (1997). Here, the testimony would not have helped the trier of fact; it would not have helped the jury determine whether Holdorph was the aggressor, as Lewis later contended. Because of the wide range of effects of various quantities of methamphetamine on diverse individuals, and because Dr. Ramos had never observed Holdorph alive, with or without methamphetamine in his system, Dr. Ramos had no idea how the methamphetamine might have affected Holdorph. And, therefore, his testimony could not have helped the jury.

¶49 Rather, as the trial court determined, this expert testimony would have been speculative and irrelevant to the issues the jury had to decide. Thus, we cannot say that excluding this evidence was an abuse of discretion, particularly given the trial court's broad discretion to determine the admissibility of expert opinion as our Supreme Court articulated in *Cheatam*.[15]

## C. Harmless Error

¶50 In the absence of specific controlling Washington authority, we note that other states have allowed such

---

[15] The dissent does not assert that the trial court's exclusion of the evidence was "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Nor does the dissent assert that such exclusion materially affected the trial's outcome. Rather, the dissent focuses on Lewis's constitutional right to present his defense and advocates reversal merely because exclusion of this evidence impinged on this right, regardless of its lack of materiality and its lack of probable effect on the trial's outcome. Dissent at 399.

390

general expert testimony.[16] Thus, we address whether error, if any, was harmless. We hold that even if the trial court erred in refusing to admit the medical examiner's testimony about the possible effects of methamphetamine in general, the error was harmless[17] because the jury would have reached the same verdict even with this excluded testimony. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996) (constitutional error is harmless when it is certain that any reasonable jury would reach the same verdict absent the error); *see also State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995).

¶51 At trial, Lewis elicited testimony that Holdorph had a high level of methamphetamine in his system at the time of his death. During closing, he argued that Holdorph's drug use could explain why Holdorph had charged at Lewis, even though Holdorph was unarmed and wearing only a towel. As the trial court had predicted, Lewis was able to advance his alternative theory that he had shot Holdorph in self-defense. (The other theory Lewis advanced was that the shooting was accidental.)

¶52 Moreover, the excluded medical examiner's testimony was speculative—he could have testified only about the widely ranging effects of methamphetamine on different

[16] *See, e.g., State v. Clemons*, 82 Ohio St. 3d 438, 696 N.E.2d 1009, 1019 (1998) (state could produce expert testimony that Prozac generally reduces aggressive behavior when defendant claimed the drug caused him to black out and commit murder), *cert. denied*, 525 U.S. 1077 (1999); *State v. Plew*, 155 Ariz. 44, 745 P.2d 102, 104 (1987) (reversed trial court error in failing to admit expert testimony of cocaine intoxication in engendering irrationality and aggressiveness); *Burch v. State*, 478 So. 2d 1050 (Fla. 1985) (juries require expert testimony from toxicologist on effects of PCP (phencyclidine) because such information is outside lay knowledge); *People v. Humphries*, 185 Cal. App. 3d 1315, 230 Cal. Rptr. 536, 548-49 (1986) (improper to exclude expert testimony that PCP could potentially have caused victim to be violence prone). *But see State v. Shabazz*, 246 Conn. 746, 719 A.2d 440, 446-48 (1998) (no error in failing to admit expert testimony on effects of narcotics when the State did not contest the fact that the victim was the initial aggressor), *cert. denied*, 525 U.S. 1179 (1999).

[17] Neither party's brief addresses whether we should review for constitutional harmless error. The State's citation to *State v. Powell*, however, suggests a concession that the constitutional harmless error standard of review applies. 126 Wn.2d 244, 267, 893 P.2d 615 (1995) (admission of hearsay in violation of the confrontation clause). Thus, we engage in constitutional harmless error analysis.

people, depending, in part, on whether a particular individual had built up a tolerance to methamphetamine and the degree of that tolerance. Moreover, the medical examiner clearly explained that he had no knowledge and no opinion about what effect the methamphetamine in Holdorph's body might have had on his behavior immediately before Lewis shot him.

¶53 Thus, the excluded testimony would not have created reasonable doubt about why Lewis shot Holdorph because (1) even if the jury had heard Dr. Ramos's equivocal testimony, there still would have been no evidence that methamphetamine had actually caused Holdorph to be aggressive in general or in particular toward Lewis immediately before the shooting and (2) Mrs. Holdorph's eyewitness testimony directly rebutted Lewis's inference that Brett Holdorph had exhibited aggressive behavior as a result of the methamphetamine in his system. Mrs. Holdorph, whom the jury obviously believed, convincingly testified that it was Lewis, not Brett Holdorph, who had been the aggressor from the moment Lewis forced his way into the Holdorphs' residence. Lewis's proffered speculative statement from the medical examiner would not have undermined the jury's acceptance of Mrs. Holdorph's credibility, nor would it have affected the jury's verdict.

¶54 We hold, therefore, that any error in excluding the medical examiner's testimony about the possible general effects of methamphetamine was harmless.

### III. Sentencing—Prior Convictions—POAA

¶55 Lewis challenges his POAA sentence to life without possibility of release on the following grounds: (1) the trial court's judicial fact finding of his prior convictions violated the United States Supreme Court's decision in *Blakely v. Washington*,[18] (2) this unconstitutional judicial fact finding included improper findings about his identity as the perpe-

---

[18] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

trator of his previous crimes, and (3) his prior convictions are facially unconstitutional because the guilty plea forms supporting these convictions did not inform him about the possibility that they might be used as "prior strike offenses" to increase his sentence if he committed some other offense in the future. These arguments also fail.

## A. *Blakely*

¶56 Lewis argues that it is unconstitutional for a trial judge to determine whether a defendant has two prior strike offenses and, thus, is eligible for sentencing under the POAA because, under *Blakely*, a jury must make this decision. We disagree.

¶57 Even before the United States Supreme Court filed *Blakely*, the Washington Supreme Court held that judicial fact finding of the existence of prior convictions for the purposes of the POAA is constitutional. *State v. Smith*, 150 Wn.2d 135, 156, 75 P.3d 934 (2003), *cert. denied*, 541 U.S. 909 (2004); *State v. Wheeler*, 145 Wn.2d 116, 124, 34 P.3d 799 (2001), *cert. denied*, 535 U.S. 996 (2002). Post-*Blakely*, Washington courts have continued to uphold this precedent. *State v. Rivers*, 130 Wn. App. 689, 694-97, 128 P.3d 608 (2005), *review denied*, 158 Wn.2d 1008 (2006); *State v. Ball*, 127 Wn. App. 956, 960-61, 113 P.3d 520 (2005), *review denied*, 156 Wn.2d 1018 (2006).

¶58 These post-*Blakely* holdings reiterate the *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), rule and note that *Blakely* specifically excluded its application to prior convictions: Juries must determine any fact, "[o]ther than the fact of a prior conviction," that increases a sentence over the statutory maximum. 542 U.S. at 301. We reject Lewis's contention that *Wheeler* and *Smith* are no longer viable. Instead, we continue to follow the Washington Supreme Court's decisions in *Smith* and *Wheeler*, recognize its recent decision in *State v. Jones*, 159 Wn.2d 231, 244, 149 P.3d 636 (2006) (jury need not decide issue of community custody because it is directly related to

the fact of a prior conviction), *cert. denied,* 127 S. Ct. 2066 (2007), and adhere to our own precedent in *Ball.* We hold, therefore, that the trial court, not the jury, determines whether a defendant has two prior strike offenses and, thus, is eligible for sentencing under the POAA.

## B. Identity

### 1. Judge, not jury, finds fact of identity of perpetrator of prior conviction

¶59 The determination of whether a defendant was convicted of prior crimes necessarily includes the identity of the prior crimes' perpetrator. *See generally Smith,* 150 Wn.2d at 143 (judicial fact finding is appropriate for prior convictions because the trial court is relying on verifiable evidence in the form of prior conviction records and because it is not weighing aggravating and mitigating circumstances).

### 2. Sufficient evidence of Lewis's identity as prior perpetrator

¶60 We further disagree with Lewis's argument that the "evidence was insufficient to prove, beyond a reasonable doubt, that the person being sentenced was the same as the person who was convicted of the prior offenses in 1994 and 1995." Br. of Appellant at 49. First, the applicable standard of proof for the trial court's finding of prior convictions is by a preponderance of the evidence, not beyond a reasonable doubt. *State v. Ford,* 137 Wn.2d 472, 479-80, 973 P.2d 452 (1999).

¶61 Second, applying the preponderance standard to the evidence here, we review the evidence in the light most favorable to the State.[19] In determining identity, the trial

---

[19] "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas,* 119 Wn.2d

court possessed certified copies of prior convictions containing Lewis's full name, birthday, Social Security number, and fingerprints. The trial court did not weigh and analyze conflicting evidence; rather, through the available data, it simply matched these previous convictions to Lewis. We hold that the evidence was sufficient to prove that Lewis was the individual who committed the prior convictions that the trial court used to sentence him under the POAA.

## C. Constitutional Validity

¶62  Lewis also challenges his prior judgments as constitutionally invalid on their faces because the guilty plea forms for these offenses do not refer to his eligibility for and potential future sentencing under the POAA.[20] This argument fails.

¶63 A defendant may challenge his sentence, despite the one-year bar of RCW 10.73.090, if he can show that his judgment and sentence is invalid on its face. *See In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 866, 50 P.3d 618 (2002). A judgment and sentence is invalid on its face if it evinces the invalidity without further elaboration. *Id.* The phrase "on its face" includes the documents signed as part of a plea agreement. *Id.* at 866 n.2 (citing *In re Pers. Restraint of Stoudmire*, 141 Wn.2d 342, 354, 5 P.3d 1240 (2000); *In re Pers. Restraint of Thompson*, 141 Wn.2d 712, 719, 10 P.3d 380 (2000)).

¶64  As our Supreme Court has explained:

[T]he relevant question in a criminal case is whether the judgment and sentence is valid on its face, not whether related documents, such as plea agreements, are valid on their face.

192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[20] Lewis suggests that the later possibility of incarceration under the POAA is a direct consequence of the plea and, thus, his ignorance about a direct consequence renders the plea unconstitutional. He also asserts that his trial counsel rendered ineffective assistance of counsel for failure to raise this defect. Because we find no such defect, we do not address his ineffective assistance of counsel argument on this ground.

Such documents may be relevant to the question whether a judgment is valid on its face, but only if they disclose facial invalidity in the judgment and sentence itself.

*In re Pers. Restraint of Turay*, 150 Wn.2d 71, 82, 74 P.3d 1194 (2003) (citing *In re Pers. Restraint of Hemenway*, 147 Wn.2d 529, 533, 55 P.3d 615 (2002)). Thus, the question before us is whether the charging documents identify a defect in the judgment. We hold they do not. Therefore the exception to the one-year time limit for Lewis to raise his challenges does not apply.

### 1. Future possible eligibility for POAA status is not a direct consequence of a guilty plea

¶65 It is well settled that the constitutional validity of a guilty plea turns, in part, on whether the defendant was informed of the direct consequences of his plea. *State v. Ross*, 129 Wn.2d 279, 284, 916 P.2d 405 (1996). A sentencing consequence is direct when " 'the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment.' " *Id.* (internal quotation marks omitted) (quoting *State v. Barton*, 93 Wn.2d 301, 305, 609 P.2d 1353 (1980)).

¶66 But a plea of guilty to a "most serious crime" neither increases the punishment for that crime nor automatically subjects a defendant to a future sentence of life without parole. The potential for the crime to count as a strike at some later time rests only on the *possibility* that the defendant will commit future crimes. *See, e.g., In re Det. of Abolafya*, 114 Wn. App. 137, 147, 56 P.3d 608 (2002) (because later civil commitment proceedings are a possibility, a defendant need not be aware of this potential when entering a guilty plea), *review denied*, 149 Wn.2d 1020 (2003). Thus, the possibility of future POAA status is not a direct consequence of a guilty plea about which a defendant must be informed before pleading guilty.

¶67 Here, Lewis committed an assault in 1994 and a kidnapping in 1995. A future sentence under the POAA was

neither imminent nor automatic because "any effect on punishment flows not from the guilty plea itself but from additional proceedings." *Ross*, 129 Wn.2d at 285. Although there was a theoretical possibility that Lewis might commit a future crime (and receive a possible future conviction and punishment), there was no definite and immediately foreseeable POAA sentence for him as a consequence of his 1994 and 1995 guilty pleas.

¶68 On the contrary, to trigger application of the POAA, Lewis would have to take affirmative steps to commit additional qualifying strike crimes. Therefore, a potential life sentence without parole as a POAA was a collateral, not a direct, consequence of his 1994 and 1995 guilty pleas. *Compare id.* at 284-85 (community placement is a direct consequence of the plea because the sentence is definite, automatic, and comes on the heels of the prison sentence) *with State v. Olivas*, 122 Wn.2d 73, 96, 856 P.2d 1076 (1993) (mandatory DNA (deoxyribonucleic acid) testing a collateral consequence even though the procedure could lead to future punishment because "[p]ossible future punishment is not a definite or immediate consequence of the testing").

¶69 Thus, Lewis could not challenge in the trial court or in this direct appeal the absence of information about such collateral consequence of his 1994 and 1995 guilty pleas when these prior plea-based convictions are later used as prior strike offenses for POAA sentencing purposes in connection with a new crime he committed after and independent of his prior guilty pleas.

## 2. Facial invalidity

¶70 The three strikes rule of the Sentencing Reform Act of 1981 requires a trial court to sentence a defendant to life imprisonment without the possibility of parole. RCW 9.94A.570. A "persistent offender" is one who has two prior "most serious" offense convictions. RCW 9.94A.030(32)(a). The State need not prove the constitutional validity of a defendant's prior convictions "unless they had been previ-

ously declared unconstitutional or were facially unconstitutional." *State v. Manussier*, 129 Wn.2d 652, 682, 921 P.2d 473 (1996), *cert. denied*, 520 U.S. 1201 (1997). "Constitutionally invalid on its face means a conviction which without further elaboration evidences infirmities of a constitutional magnitude." *State v. Ammons*, 105 Wn.2d 175, 188, 713 P.2d 719, *cert. denied*, 479 U.S. 930 (1986).

¶71 When challenging a guilty plea to be used at a later sentencing, the defendant must not only show that the plea forms were deficient but he must also show that the sentencing court deprived him of constitutional safeguards. *State v. Gimarelli*, 105 Wn. App. 370, 376, 20 P.3d 430, *review denied*, 144 Wn.2d 1014 (2001). The burden is not, as Lewis seems to suggest, on the State to prove that these 10-year-old guilty pleas were entered constitutionally. *See, e.g., Ammons*, 105 Wn.2d 175; *Gimarelli*, 105 Wn. App. 370. Rather it was Lewis's burden to show that his prior judgments (and accompanying guilty pleas), on their face, did not provide constitutional safeguards. *Ammons*, 105 Wn.2d at 189. Because Lewis cannot show that his prior guilty pleas and judgments are facially invalid, his attempted challenge on direct appeal fails.[21]

¶72 Affirmed.

¶73 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

PENOYAR, J., concurs.

¶74 ARMSTRONG, J. (dissenting) — Because I believe the trial court erred in excluding Dr. Roberto Ramos's testimony that methamphetamine can cause a person to act aggressively and irrationally, I dissent.

---

[21] Lewis's recourse, if any, is to challenge the constitutionality of any of these guilty pleas collaterally with a personal restraint petition under RAP 16.3.

¶75 The trial court characterized Dr. Ramos's testimony as irrelevant and speculative because Dr. Ramos could not say what specific behavior the victim's high level of methamphetamine would have caused. But the defendant was not obligated to prove to a certainty, or even beyond a reasonable doubt, how methamphetamine would have affected the victim's behavior. Rather, evidence of the high levels of methamphetamine in Holdorph's system was relevant because Lewis asserted self-defense and claimed that Holdorph was the aggressor. Specifically, Lewis testified that Holdorph, although not armed, charged and attacked him. Dr. Ramos's testimony that methamphetamine *can cause* such irrational aggressive behavior supported Lewis's story, making it more credible.

¶76 Moreover, unlike alcohol, the average juror is not likely to understand methamphetamine's physiological effects on the human body. *Cf. State v. Thomas*, 123 Wn. App. 771, 782, 98 P.3d 1258 (2004) (jurors can draw reasonable inferences from testimony about alcohol use) (citing *State v. Kruger*, 116 Wn. App. 685, 692-93, 67 P.3d 1147 (2003))), *review denied*, 154 Wn.2d 1026 (2005). That Dr. Ramos could not testify regarding the specific effects that methamphetamine had on Holdorph goes to the weight of his testimony, not its admissibility.

¶77 In *State v. Rangitsch*, 40 Wn. App. 771, 779, 700 P.2d 382 (1985), the court held that the trial court did not abuse its discretion in admitting expert testimony regarding the effects of cocaine use on human behavior and perception. In *Rangitsch*, the evidence established that the defendant was under the influence of cocaine when he caused a fatal car collision. *Rangitsch*, 40 Wn. App. at 773-74. To establish a nexus between the defendant's drug use and the auto accident, the State offered expert testimony regarding cocaine's effects on a person's motor skills and ability to drive. *Rangitsch*, 40 Wn. App. at 775. The court held that the trial court did not err in allowing the expert testimony under ER 702. *Rangitsch*, 40 Wn. App. at 779.

¶78 Perhaps more instructive is the Arizona Supreme Court's decision in *State v. Plew*, 155 Ariz. 44, 745 P.2d 102 (1987). In *Plew*, the court held that "the effect of cocaine intoxication on mental and physical behavior is a proper subject for expert testimony in an appropriate case." *Plew*, 745 P.2d at 106. There, the defendant in an attempted murder case tried to show that he shot the victim, who was high on cocaine, in self-defense after the victim pointed a gun at him. *Plew*, 745 P.2d at 103. The defendant sought to introduce expert testimony regarding the general effects of "cocaine intoxication," but the trial court ruled the evidence inadmissible due to a lack of proof that the victim was under the influence of cocaine and a lack of particularized information about the drug's effect on the victim. *Plew*, 745 P.2d at 104. The Arizona Supreme Court held that because the testimony would have assisted the jury in understanding the evidence, the court should have admitted the expert testimony under Rule 702, Arizona Rules of Evidence. *Plew*, 745 P.2d at 106. The court stated that the expert's testimony was particularly appropriate because the defendant claimed self-defense, alleging that he tried to protect himself from the attack of a person under the influence of cocaine—a condition that is not within the experience of the average juror. *Plew*, 745 P.2d at 106.

¶79 Here, the trial court allowed evidence that the victim had a relatively high level of methamphetamine in his blood. But the court rejected Lewis's attempt to explain the possible effects of methamphetamine, several of which supported his self-defense claim. In so ruling, the court denied Lewis his constitutional right to present a defense. *See State v. Cheatam*, 150 Wn.2d 626, 648, 81 P.3d 830 (2003) (citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)). I would reverse and remand for a new trial.

Review denied at 163 Wn.2d 1030 (2008).