**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

April 5, 2016

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46729-1-II |
| Respondent, | |
| v. | |
| TODD EDWARD FEARS, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Todd Edward Fears appeals his convictions for residential burglary, theft in the third degree, and attempting to elude a pursuing police vehicle. He argues that the trial court erred in excluding testimony from an expert witness regarding the reliability of eyewitness identifications. Fears also challenges the discretionary legal financial obligations (LFOs) that the trial court imposed.

Although the trial court abused its discretion in excluding the expert's testimony, such error was harmless. Additionally, Fears waived the challenge to his LFOs by failing to object to them during sentencing. We affirm the judgment and sentence.

FACTS

On the morning of May 3, 2014, Laura Cohen took her dog for a walk near her home and fenced property. Soon after she started, she saw a white car stop and then proceed down the road. As the car passed her, she waved at the driver and passenger. She could see the two men in the car clearly because its windows were down and it was moving slowly.

About 5 to 10 minutes later, the same car drove by Cohen again. Cohen continued to walk for another 20 to 25 minutes. As she approached her home, she saw the white car in her driveway and the two men running down the driveway toward the gate and the car. When she asked what

they were doing, one of them waved at her with a piece of paper in his hand. Cohen's house was for sale, and she assumed it was a sales flyer from the flyer box. The man waved the piece of paper over his head and said, "I'm looking at the house, and there's a big pit bull in the yard and it just bit me." 1 Report of Proceedings (RP) at 37. This comment confused Cohen because she did not have a pit bull. Cohen also saw that the other man carried a large backpack.

Cohen watched as both men got into the car. The men backed the car up toward her to leave, and Cohen yelled that she was going to call the sheriff and that she knew the license plate. Cohen then called the sheriff's office, reported the license plate, and described the car and the two men.

While still on the phone, Cohen entered her house and discovered that she had been burgled. The closet door to her home office was open and a safe containing important documents was gone. Cohen's jewelry was also missing. Cohen estimated that the value of the stolen items was about $14,000.

Lewis County Sheriff's Deputy Matt Schlecht responded and interviewed Cohen about the burglary. During the interview, dispatch was attempting to locate the suspect vehicle based on the license plate number. Using a program that allows searches for vehicles with similar plate numbers, dispatch came up with a white Mitsubishi registered to Kelso resident Tammy Nevills. The plate number that Cohen provided to dispatch and the plate number on Nevills's car were different by one character.[1] Shortly after the sheriff's department contacted the Kelso police about the white Mitsubishi, Nevills called the police to report that her car had been stolen. An officer went to Nevills's work to take a report. While there, Nevills provided a written statement to the

---

[1] Cohen reported a license plate of A0Y0395, while Nevills's plate was A0Y0695.

2

officer explaining that Fears, her boyfriend, had told her to report the car stolen. Nevills added that Fears was driving the car on May 3.

The officer promptly reported Nevills's statement to dispatch, and dispatch called Schlecht, who was still interviewing Cohen. Dispatch advised Schlecht that Fears had been driving the white car that day. Schlecht asked Cohen to describe the suspect and Schlecht pulled up Fears's Department of Licensing photograph on his computer. When he showed Cohen the photograph, she said that Fears "kind of" looked like the man she had seen in the car.[2] 1 RP at 108. She said that the man had the same facial structure as Fears and looked the same, except for being heavier.

Schlecht relayed this information to Deputy Jeremy Almond. As Almond travelled northbound on a nearby highway, he saw a white car traveling southbound at a high rate of speed. Almond turned on his overhead lights and siren and pursued the white car. During the pursuit, somebody threw a safe from the white car. Almond dodged it and saw papers in the air. Almond called off the pursuit because he thought it was too dangerous. He thought he observed two people in the white car

Two women who observed the pursuit saw a safe on the right of the roadway with papers flying everywhere. As they pulled over to pick up the papers, another driver stopped to pick up the safe. Both the safe and the papers were turned over to the sheriff's office, and Cohen subsequently identified them as items stolen from her house.

On May 6, Deputy Tyson Brown asked Cohen if she would be willing to look at a photo montage with photographs of six different men. Brown told Cohen that the person she had seen on her property might not be featured in the montage. Cohen agreed to participate, and upon seeing

---

[2] Cohen later testified that when Schlecht showed her the photograph, she said, "That's the guy." 1 RP at 46.

the montage, she "immediately" picked out the photograph of Fears. 2 RP at 29. Brown followed department protocol in showing Cohen the montage, which is to show a witness six photographs of individuals and explain to the witness that the suspect may or may not be one of the individuals.

The State charged Fears with residential burglary, theft in the second degree,[3] and attempting to elude a pursuing police vehicle. At Fears's trial, Cohen, Nevills, several officers, and the passersby who recovered the papers and safe testified to the above facts. Cohen identified Fears as the driver of the white car.

The defense sought to admit the testimony of an expert witness, Dr. Stephen Ross, to testify about how an eyewitness's repeated exposure to an individual's photograph increases the eyewitness's confidence about the culpability of that individual. The offer of proof indicated Dr. Ross, an associate professor of psychology at the University of Washington—Tacoma, had published several reports on eyewitness memory and investigative interviewing. Dr. Ross also stated that he served on a committee that was developing best practice guidelines for collecting eyewitness evidence in Washington. He opined that an eyewitness's repeated exposure to photographs can lead to evidence that is less reliable than the initial identification procedure. On cross-examination, Dr. Ross confirmed that the committee was in the process of developing minimal best practices, but none had yet been adopted in Washington. At the end of his offer of proof, defense counsel summarized Dr. Ross's theory as follows: "[T]he best identifications are the ones that come immediately. The farther down the road you get they're less reliable."

After observing that a substantial amount of circumstantial evidence supported Cohen's identifications of Fears, the trial court concluded that it would be error for Dr. Ross to impugn

---

[3] At trial Cohen could not provide the fair market value of the jewelry, and the State amended the theft charge to theft in the third degree.

Cohen's testimony when no protocols leading to his criticisms had been adopted. The court reasoned further that there was no need for an expert to explain that subsequent identifications could be influenced by previous identifications. The trial court excluded Dr. Ross's testimony because it would not be helpful to the jury and was not generally accepted in the relevant scientific community.

During closing argument, the State referenced Cohen's multiple identifications of Fears as the person who burglarized her home. Defense counsel argued that Cohen's first identification of Fears had been uncertain, and he added that "common sense" dictated that the initial identification was the most reliable. 2 RP at 128.

The jury found Fears guilty as charged and the trial court imposed concurrent sentences totaling 84 months of incarceration. Without checking a preprinted box in the judgment and sentence stating that Fears had the ability to pay, the trial court also imposed discretionary and mandatory LFOs totaling $5,847.83. Fears appeals.

## ANALYSIS

### I. EXPERT WITNESS TESTIMONY

Fears argues that the trial court deprived him of due process and the right to present a defense by excluding his proposed expert testimony.[4] While we agree that the trial court erred in excluding the expert testimony, the error was harmless.

A defendant in a criminal case has a constitutional right to present the testimony of witnesses in order to establish a defense. *State v. Cheatam*, 150 Wn.2d 626, 648, 81 P.3d 830 (2003). But a defendant's constitutional right to present evidence is not absolute. *State v. Jones*,

---

[4] Fears asserts that we should employ a de novo standard of review. As we explain, the standard of review is abuse of discretion.

168 Wn.2d 713, 720, 230 P.3d 576 (2010). A defendant has no right to introduce irrelevant or inadmissible evidence. *Jones*, 168 Wn.2d at 720.

The admission of evidence lies largely within the trial court's discretion, and the court's decision will not be reversed on appeal absent an abuse of discretion. *State v. Franklin*, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014); *see also Cheatam*, 150 Wn.2d at 646 (admission of expert testimony on reliability of eyewitness identification is within trial court's discretion). Washington courts apply an abuse of discretion standard even when a defendant seeks to exercise his constitutional right to present evidence in his defense by offering expert testimony. *State v. Lewis*, 141 Wn. App. 367, 385, 166 P.3d 786 (2007). "An erroneous evidentiary ruling that violates the defendant's constitutional rights, however, is presumed prejudicial unless the State can show the error was harmless beyond a reasonable doubt." *Franklin*, 180 Wn.2d at 377 n.2.

ER 702 allows experts to testify regarding "scientific, technical, or other specialized knowledge" if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert's opinion is admissible if the witness is properly qualified and relies on generally accepted theories, and if the expert's testimony is helpful to the trier of fact. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 168, 288 P.3d 1140 (2012). "Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

An expert's testimony, however, should not exceed the limits of the underlying science. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir 1923). Under *Frye*, the proponent of an expert's opinion must make a foundational showing that the opinion was based on a generally accepted theory or methodology. 295 F. at 1014. Washington courts have adopted this standard. *State v. Copeland*, 130 Wn.2d 244, 263-64, 922 P.2d 1304 (1996). This foundation must be established

by a preponderance of the evidence. *State v. Nava*, 177 Wn. App. 272, 289-90, 311 P.3d 83 (2013), *review denied*, 179 Wn.2d 1019 (2014). Moreover, if eyewitness identification is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of the eyewitness testimony. *Cheatam*, 150 Wn.2d at 649.

Here, Fears offered Dr. Ross's expert testimony to call into question the legitimacy of Cohen's identification of Fears. His offer of proof indicated Dr. Ross would have explained the science on the negative compounding effect of eyewitness identifications that start, as here, with the display of a single picture of the suspect. Dr. Ross further would have testified that subsequent exposure to suggestive information can alter the memory and increase the witness's confidence, creating the possibility that erroneous testimony will be delivered with a high degree of confidence. To present this evidence, Fears must make a foundational showing that the opinion was based on a generally accepted theory or methodology. *See Frye*, 295 F. at 1014. While Dr. Ross admitted some of the identification protocols he advocated had not yet been adopted in Washington, his opinion regarding the suggestive impact on a witness who is repeatedly exposed to photographs of a suspect is a generally accepted theory. In other words, the lack of official protocol is not the essence for excluding expert testimony if the underlying theories are otherwise part of an accepted theory or methodology. *See Frye*, 295 F. at 1014.

Here, eyewitness evidence comprised a key component of the State's case. Dr. Ross had the qualifications to testify as an expert in the area of eyewitness identifications and he relied on generally accepted theories. His testimony would have been helpful to the trier of fact. Therefore, the trial court abused its discretion in excluding Dr. Ross's testimony. Our analysis, however, does not end here.

Because an error of constitutional magnitude can be harmless if it is proved to be harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), we next analyze the exclusion of Dr. Ross's testimony for harmless error. An error of constitutional magnitude is harmless "if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002). In this analysis, we may look at such factors as the importance of the witness's testimony, the cumulativeness of the testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Chapman*, 386 U.S. at 24.

Here, Cohen testified she saw a white car in her driveway at the time of the burglary. She provided dispatch with a license plate that, but for one character, matched the plate on the white car in her driveway. Per Fears's girlfriend, Fears drove the vehicle on the date and time in question, and he had her report the car stolen. Based on the cumulativeness of the testimony and the strength of the State's case, we are convinced beyond a reasonable doubt the jury would have reached the same result. Therefore, the error is harmless.

II.     LFOs

Fears argues next that the trial court erred in imposing discretionary LFOs without determining his ability to pay.[5] We decline to reach the merits of his argument.

Fears did not challenge the imposition of discretionary LFOs during sentencing. We exercise our discretion and decline to consider Fears's challenge to his LFOs. *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015). Our decision in *Blazina*, issued before Fears's

---

[5] Fears does not challenge his mandatory LFOs, which included a $500 victim assessment, a $200 criminal filing fee, and a $100 DNA fee. *See State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013) (legislature has divested courts of discretion to consider defendant's ability to pay when imposing mandatory LFOs).

sentencing, provided notice that the failure to object to LFOs during sentencing potentially waives a related claim of error on appeal. *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492 (2013), *remanded*, 182 Wn.2d 827. As our supreme court noted, an appellate court may use its discretion to reach unpreserved claims of error. *Blazina*, 182 Wn.2d at 830. We decline to exercise such discretion here.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, P.J.

Lee, J.