**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84759-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MICHAEL A. SENDEJO, | |
| Appellant. | |

MANN, J. — Michael Sendejo appeals his conviction for second degree murder. Sendejo argues that the trial court erred by (1) admitting statements he made to police, (2) violating his right to present a defense by excluding a toxicology report, and (3) denying his request for a mitigated sentence. Sendejo also argues that the Victim Penalty Assessment (VPA) and DNA collection fee should be stricken. We remand to strike the VPA and DNA collection fees. We otherwise affirm.

I

A

Following the loss of his job due to the COVID-19 pandemic, Sendejo became temporarily unhoused. Sendejo came to Seattle, where he camped in City Hall Park.

In 2021, many unhoused people set up tents and occupied City Hall Park. The park became volatile and violent. Sendejo began carrying a concealed 10-inch chef's knife in his sock or boot. Because of the violence, Seattle Police Department (SPD) had a protocol in place for responding to calls that included sending at least three officers and a sergeant to every call, no matter the call type.

On June 17, 2021, SPD responded to a call that a male had been stabbed in City Hall Park. When SPD arrived, they observed Sendejo standing in the corner of the park holding a knife. Sendejo dropped his knife and complied with the officers' instructions.

Officers found a man, later identified as Bradley Arabie, lying down with his upper body inside a tent, he had visible stab wounds to his chest, he was unconscious and officers could not find a pulse. Arabie was pronounced dead at the scene.

Sendejo was placed in handcuffs and advised of his Miranda[1] rights. Sendejo's knife was recovered.

Sendejo asked to speak with Officer Deanne Kozel, whom he was familiar with.[2] Sendejo explained to Kozel that Arabie had been messing with him all day, approached him and asked for his knife. Sendejo told Arabie "no." Arabie threatened to punch Sendejo if he didn't give him his knife and then punched Sendejo in his left eye. Following the punch, Sendejo picked Arabie up by the hips and threw him to the ground.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] Officer Kozel had a body-worn video operating at the time. The recording was admitted as exhibit 6 and a transcript of the recoding was admitted for illustrative purposes as exhibit 7.

Exhibit (Ex.) 7 at 5. Sendejo admitted to choking and stabbing Arabie multiple times. Ex. 7 at 3, 5, 10.[3]

While Sendejo repeatedly asserted that he acted in self-defense, he also told Kozel that he "had the advantage the entire time I was on top." He also exclaimed multiple times that he was glad that Arabie was dead.

Sendejo claimed that Arabie had a box cutter. Sendejo suffered a large laceration on his shoulder and additional cuts and bruises. No other weapon was recovered from the scene. The tents in the park, however, were propped up on wooden pallets nailed together. Kozel observed nails protruding from pallets in the tent that was knocked over during Sendejo and Arabie's fight.

Despite Sendejo's injuries, Sendejo refused transport to the hospital. He was treated briefly on the scene by the Seattle Fire Department and then transported to SPD headquarters.

At SPD headquarters, Detective Daniel Conine gave Miranda warnings to Sendejo for the second time. Sendejo invoked his right to remain silent. Conine photographed Sendejo's condition and injuries. While being photographed, Sendejo made several incriminating statements.

About two hours later, lead Detective Donald Waters gave Sendejo Miranda warnings for the third time. Sendejo said that he understood his rights and proceeded to answer questions from Waters for about two hours. During the interview, Sendejo

---

[3] The autopsy revealed the fatal wound was a stab into Arabie's heart. Arabie had been stabbed at least 14 times and had suffered hemorrhage in the neck muscle, a fracture in his thyroid cartilage, and petechiae in his eyes, all consistent with strangulation.

more fully described his version of the incident and made multiple incriminating statements.

After speaking with Waters, Sendejo was transported to Harborview before being booked into the King County Correctional Facility.[4]

B

Sendejo was charged with murder in the second degree, felony murder (count 1), and murder in the second degree, intentional murder (count 2), with deadly weapon enhancements attached to both counts. Sendejo asserted a general denial defense and self-defense.

Sendejo moved in limine to exclude statements he made to Detectives Conine and Waters. Sendejo asserted that the detectives had not scrupulously honored his right to remain silent.

Following a CrR 3.5 hearing, the trial court concluded Conine's actions while photographing Sendejo were not the functional equivalent of interrogation. The court also concluded that the time between the end of the photographing and the advisement of Miranda rights by Waters was a significant period of time for law enforcement to reengage Sendejo, and that Sendejo made a knowing, intelligent, and voluntary waiver of his right to remain silent. Accordingly, the trial court concluded that none of Sendejo's statements were inadmissible because "all statement(s) were voluntary, knowingly, and intelligently given after being properly and fully advised of his Miranda Rights or the defendant gave spontaneous or non-responsive statements."

---

[4] Sendejo received 14 stitches for the laceration on his shoulder, the laceration was not deep and was able to be treated in the ER. He had one other small laceration repaired with Dermabond, a skin glue. Sendejo's remaining injuries did not require treatment or repair.

Sendejo also sought to admit a toxicology report that determined Arabie was positive for methamphetamine, amphetamine, and flubromazolam at the time of death. The trial court denied Sendejo's request to admit the levels of drugs from the toxicology report but did permit him to introduce evidence that Arabie was seen using drugs the day of the incident and tested positive for amphetamines and methamphetamine. The trial court found the levels were not relevant to any element of the crime charged or of Sendejo's reasonable fear.

The jury convicted Sendejo as charged.[5]

At sentencing, the State requested the middle of the standard range sentence. Sendejo filed a sentencing memorandum that requested an exceptional mitigated sentence of 51 months, below his standard range of 147-247 months, based on his offender score of zero. The trial court denied Sendejo's request for an exceptional sentence and imposed the low end of the standard range.

Sendejo appeals.

II

Sendejo contends that the trial court erred in denying his motion to suppress the statements he made to Detectives Conine and Waters. Sendejo asserts the detectives did not "scrupulously honor" his Fifth Amendment right to remain silent. We disagree.

The Fifth Amendment provides, in pertinent part, "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966),

---

[5] Count 1 was vacated because conviction for both counts 1 and 2 would violate double jeopardy.

the Supreme Court adopted procedural safeguards to protect the privilege and held that before questioning an individual in custody, the police must clearly inform the suspect:

> [T]hat he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

After warnings have been given, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Miranda, 384 U.S. at 479. If a suspect in custody invokes his right to remain silent, law enforcement must cease interrogation. State v. Chambers, 197 Wn. App. 96, 129, 387 P.3d 1108 (2016). At that point, the individual "has shown that he intends to exercise his Fifth Amendment privilege." Miranda, 384 U.S. at 473-74. "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." Miranda, 384 U.S. at 474.

But Miranda is not a per se prohibition on further interrogation. Michigan v. Mosley, 423 U.S. 96, 102, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104 (quoting Miranda, 384 U.S. at 474, 478-79).

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the findings support the conclusions of law.  Chambers, 197 Wn. App. at 131.[6]

A

We first address Sendejo's assertion that he was interrogated by Conine after he invoked his right to remain silent.  Sendejo contends that the questions asked were likely to elicit incriminating responses and, as a result, Conine did not scrupulously honor Sendejo's right to remain silent.  The State argues that Sendejo's statements to Conine were not the product of any interrogation.  We agree with the State.

"'Interrogation' under Miranda refers not only to express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).  "The test for the latter category focuses primarily on the suspect's perceptions, rather than the officer's intent."  In re Pers. Restraint of Cross, 180 Wn.2d 664, 685, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018).  "This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the

---

[6] While Sendejo also moved to suppress the statements he made to Officers Kozel, Dave, and O'Keefe at the scene, Sendejo has not renewed his argument on appeal.  The trial court found those statements admissible because the officers properly advised Sendejo of his Miranda rights before questioning and Sendejo stated he understood his rights and did not invoke his right to remain silent.  The trial court also found Sendejo's statements were freely given and spontaneous, and the officers did not make any threats or promises.

underlying intent of the police." Innis, 446 U.S. at 301. On the other hand, incriminating statements that are not responsive to an officer's remarks are not products of interrogation. State v. Bradley, 105 Wn.2d 898, 904, 719 P.2d 546 (1986). "An officer's comment is designed to elicit an incriminating response when a suspect's choice of replies to that comment are all potentially incriminating." Cross, 180 Wn.2d at 676.

The trial court found, and the parties do not dispute, that Sendejo was properly advised of his Miranda rights and "unequivocally" invoked his right to remain silent before meeting with Conine.[7] The trial court concluded, however, that Sendejo was not interrogated by Conine. The trial court explained:

> None of the detective's commands were in the form of a question designed to [elicit] incriminating statements from the defendant. Despite this, while the detective was documenting the defendant's injuries, the defendant made a mixture of spontaneous and non-responsive statements. Detective Conine asked very few questions of the defendant and all the questions posed by the detective were reasonably related to the documenting of the injuries. Det Conine's questions/commands did not amount to an interrogation.

While Sendejo argues that Conine's questions pertaining to his injuries were specifically designed to elicit incriminating information about the crime, we disagree.[8] While Conine conceded that photographing a suspect could lead to a suspect making statements, he testified that he "needed to document [Sendejo's] injuries" and recalled asking "questions specifically related to [Sendejo's] injuries or wellbeing . . . [and] specifically asking about additional injuries that I couldn't see."

---

[7] The trial court found the testimony of both officers credible.

[8] Following Sendejo's invocation, Conine also asked several innocuous questions including whether Sendejo needed anything to eat or drink, or to use the bathroom. Pretrial Ex. 2 at 4. Sendejo has not challenged or disputed the appropriateness of these questions.

For example, Conine appeared to respond to some expression of pain by Sendejo when he directed him to raise his arm:

> CONINE: Whenever you feel like you can, if you can just raise your arm, just like your elbow, you have a mark underneath your armpit. And is that hurting your shoulder? Like I think that's probably—
>
> SENDEJO: Yeah, that's where that asshole cut me and stab[bed] me, I'm pretty sure.

Pretrial Exhibit (Ex.) 2 at 5. Conine also asked about specific injuries and whether there were any he could not see:

> CONINE: . . . So you got a bruise there? Like if you can tell me where—I can obviously see cuts and marks, but if you have anything where you feel like I'm missing, like that's—
>
> SENDEJO: Because like I said, I was on this side, and his right hand was — so all my injuries were coming from this side because he had the stupid, whatever, the box cutter, whatever. And when I was close to him, that's when he was cutting me.

Pretrial Ex. 2 at 5-6.

> CONINE: Do you feel like you have any injuries like higher up on your thighs or genitals or anywhere on your hips or anything like that?
>
> SENDEJO: It's just like I said from in between when I had him on my tent, he was doing this thing. And this stuff comes from we were sliding on my tent and on the ground to where that other tent was. Also when I encountered him over there, yep.

Pretrial Ex. 2 at 8.

Sendejo also made spontaneous statements to general directions from Conine:

> CONINE: All right. And maybe turn to the side.
>
> SENDEJO: Ow.
>
> CONINE: Yeah.

SENDEJO: This is just from the struggle in general from us sliding on the whatever the—where my house was. Like I said, I lifted him up like this and then slammed him onto my house. And as soon as I got on top of him, that's when he was doing this stuff because I was close to him, that's why. But I was trying to grab ahold of his legs to control him. Whatever happened, it didn't happen until we got (inaudible) encountered him. He was begging for his life, I could care or less. His life or my life. I imagine my life a little bit more than he did. He was begging for his life, I could care less. Fuck that.

Pretrial Ex. 2 at 6-7.

CONINE: And if you can face me, so you've got kind of a bump on your forehead—

SENDEJO: That was the punch, the initial punch started coming from. I took a couple of hits. But after that, he was on his own.

Pretrial Ex. 2 at 12.

CONINE: So if you want to just stand up, I'm just going to kneel down in front of you and take some pictures, okay? In fact, if it would be okay, do you mind just sitting down and it would be a little more comfortable and you can just kind of spread your leg out. There you go.

SENDEJO: It just happened all in the (inaudible) no, but he was high. He was high on meth. And he encountered me at the wrong time. I try to give him as much leeway and try to be as humble and try to ignore the stupid asshole. He encounter[ed] me at the wrong time. He punch[ed] me because he said that he wanted to go down the hill and fight. And he said if you don't give me your knife, I'm going to punch you. And I'm going to punch you anyways. So that's what he did. So that's why the fight started. He started it, I finished it, I'm good.

Pretrial Ex. 2 at 7. While this could be construed as a question, the question was whether Sendejo was willing to sit down and pose a particular way.

When collecting Sendejo's clothing, Sendejo exclaimed "[h]e was looking for it all day. I tr[ied] to avoid him (inaudible) and he encounter[ed] me. And he made a life choice, I made a life choice. I ch[ose] to take his life because he wanted to take my life." Pretrial Ex. 2 at 8.

-10-

Conine's questions were straightforward, non-deceptive attempts to photograph Sendejo's injuries and to determine the state of Sendejo's physical health. Conine's questions and directions were not designed to elicit an incriminating response from Sendejo. Sendejo could have responded in many ways, including non-verbally, that would not have been potentially incriminating. Cross, 180 Wn.2d at 676. The statements did not reflect a measure of compulsion beyond that inherent in custody alone. The trial court was not clearly erroneous in finding that all the questions posed by the detective were reasonably related to the documenting of the injuries and did not amount to an interrogation.[9]

We conclude therefore that the trial court did not err by admitting Sendejo's statements to Conine.[10]

B

Sendejo asserts that his "non-waiver of his right to remain silent with Detective Conine is intimately linked to the inadmissibility of his statements to Detective Waters." He alleges that because Conine continued to interrogate him, he never waived his right to remain silent, and that Waters continued to ignore his invocation. The State argues

---

[9] In a statement of additional authorities submitted after oral argument, Sendejo refers us to State v. Denney, 152 Wn. App. 665, 218 P.3d 633 (2009), abrogated on other grounds by Cross, 180 Wn.2d 664. In Denney, the defendant was booked on a charge of possession of illegal drugs and was asked in a booking questionnaire whether she had used illegal drugs in the last few days. 152 Wn. App. at 667-68. The appellate court held that the questions were reasonably likely to produce an incriminating response because they invited an answer that would be a direct admission of guilt. Denney, 152 Wn. App. at 673. In contrast here, Conine's questions were specific to Sendejo's injuries and documenting them and could have been answered in a myriad of non-incriminatory ways.

[10] Sendejo also challenges the trial court's finding that Sendejo implicitly waived his previous invocation of the right to remain silent by discussing the fight with Conine. Because we conclude under Innis that this was not an interrogation, we do not address this argument. Innis, 446 U.S. at 298 n.2 ("Since we conclude that the respondent was not 'interrogated' for Miranda purposes, we do not reach the question whether the respondent waived his right under Miranda.").

Sendejo's statements to Waters were pursuant to a valid waiver of <u>Miranda</u> rights. We agree with the State.

In <u>State v. Wheeler</u>, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987), our Supreme Court held that in determining the validity of a waiver of a previously asserted right to remain silent, the court may consider as relevant factors:

> (1) whether the right to cut off questioning was scrupulously honored; (2) whether the police engaged in further words or actions amounting to interrogation before obtaining a waiver; (3) whether the police engaged in tactics tending to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary.

Once a suspect has invoked the right to remain silent, the police "may not resume discussion with the suspect until the suspect reinitiates further communication with the police, or a significant period of time has passed and officers reissue a fresh set of <u>Miranda</u> warnings and obtain a valid waiver." <u>Cross</u>, 180 Wn.2d at 674 (citing <u>Miranda</u>, 384 U.S. at 473-74; <u>Mosley</u>, 423 U.S. at 103-04). "Through the exercise of [a suspect's] option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." <u>Mosley</u>, 423 U.S. at 103-04.

Readvising an "individual of [their] <u>Miranda</u> rights demonstrates that [an] earlier decision to remain silent has been recognized by the police, and also reminds the individual that [they] can continue to exercise those rights." <u>State v. Boggs</u>, 16 Wn. App. 682, 687, 559 P.2d 11 (1977). When the police either reopen a formal interrogation or solicit a response from a defendant in some other way, such statements will be admissible only if they were preceded by the <u>Miranda</u> warnings. <u>Boggs</u>, 16 Wn. App. at 687.

In Mosley, Mosley was advised of his rights before his initial interrogation and said he understood. 423 U.S. at 104. When Mosley said he did not want to discuss the robberies that precipitated his arrest, the detective immediately ceased the interrogation and did not try to resume questioning or persuade Mosley to reconsider. Mosley, 423 U.S. at 104. After more than two hours, Mosley was questioned by a different officer at a different location and about a different crime. Mosley, 423 U.S. at 104. Mosley was again given Miranda warnings at the start and "was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options." Mosley, 423 U.S. at 104-05. The Supreme Court concluded that Mosley's "right to cut off questioning" was fully respected. Mosley, 423 U.S. at 104.

But Mosley "does not prescribe a bright line test" and "[a]lthough the Court in Mosley states two hours was a 'significant period of time,' the Court does not suggest a durational limit." Chambers, 197 Wn. App. at 132 (quoting Mosley, 423 U.S. at 106).[11]

In Chambers, this court explained, "[t]he touchstone of the analysis under Mosley is whether a review of the circumstances leading up to the statements made to police show the right to cut off questioning was fully respected." 197 Wn. App. at 133-34 (internal quotations omitted). Chambers was arrested and advised of his Miranda rights at 10:51 p.m. and stated that he did not want to speak to police. Chambers, 197 Wn. App. at 134. He was then driven to SPD headquarters, asked no questions during the drive, placed in an interrogation room, given water, and left alone for about two-and-a-

---

[11] While in Mosley the latter questioning pertained to a separate crime, Washington and federal courts have not treated the nonexclusive factors considered in Mosley as dispositive. See Chambers, 197 Wn. App. at 132-33 (collecting cases); Wheeler, 108 Wn.2d at 238-39.

half hours. Chambers, 197 Wn. App. at 134. At 3:07 a.m., after obtaining a warrant, officers drove Chambers to Harborview for a blood draw. Chambers, 197 Wn. App. at 134. During the drive, unsolicited, Chambers stated "I don't want to talk about this." When they returned to the car at 3:50 a.m., officers read Chambers his Miranda rights again. Chambers, 197 Wn. App. at 134. Chambers said he understood the rights and did not invoke his right to remain silent. Chambers, 197 Wn. App. at 134. Officers asked if they should go back to headquarters and have a talk and Chambers said yes. Chambers, 197 Wn. App. at 135. Before starting the interview, officers read Miranda warnings again and Chambers said he understood and agreed to talk. Chambers, 197 Wn. App. at 135. This court concluded the undisputed facts supported the conclusion that Chambers' right to cut off questioning was scrupulously honored by police. Chambers, 197 Wn. App. at 135-36.

As for Sendejo's statements to Waters, the trial court found "the time between the end of the photographing of the defendant and the advisement of Miranda Rights by Det[.] Waters was a significant period of time for law enforcement to reengage with the defendant." "The defendant did not re-invoke his rights once he was read his Miranda Rights a third time and instead made a knowingly, intelligently, and voluntary waiver and freely spoke with Det. Waters."

As in Chambers, the circumstances leading to Waters' interview of Sendejo show the police scrupulously honored Sendejo's right to cut off questioning. While Sendejo explicitly invoked his right to remain silent to Conine, Conine scrupulously honored this right and did not ask Sendejo a single question related to the incident or engage in further words or actions amounting to interrogation. Instead, Sendejo gave statements

-14-

that were spontaneous and nonresponsive. And Conine essentially ignored the incriminatory statements Sendejo repeatedly made.

Nor does the video reflect that officers used any tactics that could coerce Sendejo into changing his mind. Pretrial Ex. 1. The officers offered Sendejo water, food, and bathroom breaks, and explained the process they had to go through. At this point, Sendejo had been given Miranda warnings twice and nothing in the record reflects that he did not understand his rights.

When Waters entered the interrogation room, he explained to Sendejo that since he was new to talking to him, he was going to go over Sendejo's rights again. Waters issued Miranda warnings to Sendejo for the third time. Pretrial Ex. 2 at 12-13. Sendejo stated that he understood his rights and he did not invoke his right to remain silent. Pretrial Ex. 2 at 13. About two hours had elapsed since Sendejo invoked his right to remain silent. Sendejo had been left alone, but checked on, for about 1 hour and 40 minutes. Pretrial Ex. 1.[12] Thus, a significant period of time had elapsed since Sendejo invoked his rights when Waters re-advised Sendejo of his Miranda rights to attempt a formal interrogation. Sendejo could have but did not re-invoke his rights.

We conclude that the circumstances leading up to the interview show the police scrupulously honored Sendejo's right to cut off questioning, and the trial court did not err in denying the motion to suppress the statements Sendejo made to Waters.

_____

[12] Conine gives Miranda warnings and Sendejo invokes at Pretrial Ex. 1, at 23 min., 39 sec. Conine and the other officers leave Sendejo alone and close the door at Pretrial Ex. 1, at 43 min., 42 sec. Sendejo is checked on twice. Pretrial Ex. 1, at 1 hr., 18 min., 10 sec.; 1 hr., 20 min., 21 sec. Waters enters the room and gives Miranda warnings at Pretrial Ex. 1, at 2 hr., 27 min., 25 sec.

-15-

III

Sendejo next challenges the trial court's decision to exclude a toxicology report detailing Arabie's level of drug intoxication.  Sendejo argues that the exclusion of the evidence violated his right to present a defense by precluding him from presenting evidence to bolster his theory that he acted in self-defense.  We disagree.

Both the United States and Washington State Constitutions guarantee a defendant's right to compulsory process and to confront the witnesses against him.[13] U.S. CONST. amend. VI; CONST. art. I, § 22.

Evidentiary rulings alleged to have violated a defendant's constitutional right to present a defense are reviewed in a two-step process.  State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022) (citing State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019)).  First, we review the challenged evidentiary rulings under an abuse of discretion standard.  Jennings, 199 Wn.2d at 58-59; Arndt, 194 Wn.2d at 797.  A trial court abuses its discretion if no reasonable person would take the view it adopted.  State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

Second, if we find no abuse of discretion, we consider de novo whether the ruling violated the defendant's constitutional right to present a defense.  Jennings, 199 Wn.2d at 58-59; Arndt, 194 Wn.2d at 798.  The right to present testimony and evidence in one's own defense is not without limitation and "the Constitution permits judges to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues."  State v. Orn, 197 Wn.2d 343, 352,

---

[13] Courts and litigants often refer to these rights collectively as the "right to present a defense," although this phrase does not appear in our state or federal constitutions.  State v. Bedada, 13 Wn. App. 2d 185, 193 n.2, 463 P.3d 125 (2020).

482 P.3d 913 (2021) (quoting Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)) (alterations in original).  Importantly, there is "a distinction between evidence that merely bolsters credibility and evidence that is necessary to present a defense."  Jennings, 199 Wn.2d at 66-67.

A

Sendejo argues that the trial court erred by ruling that the evidence was irrelevant and asserts the evidence would neither confuse nor invite speculation from the jury.  We disagree.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.  The "threshold to admit relevant evidence is very low.  Even minimally relevant evidence is admissible."  State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).  For evidence to be relevant, there must be a logical nexus between the evidence and the fact to be established.  State v. Cochran, 102 Wn. App. 480, 486, 8 P.3d 313 (2000).

The proponent of the evidence bears the burden of establishing its relevance and materiality.  State v. Pacheco, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  ER 403.

Here, Sendejo sought to introduce a toxicology report done on Arabie postmortem.  The State did not object to testimony about the presence of the drugs found in Arabie's toxicology screening but objected to introducing the specific level of drugs as irrelevant.

In excluding the toxicology report, the trial court explained:

The Court finds that the level of methamphetamine in Mr. Arabie's blood is not relevant to any element of the crime charged or of Mr. Sendejo's reasonable fear. First, Mr. Sendejo did not know these levels of methamphetamine in the blood at the time the incident occurred. They were learned only after Mr. Arabie's death so the Court finds they are not relevant to Mr. Sendejo's reasonable fear.

Second, without testimony that connects these higher levels that were close to the toxic range—and compounding use with some increase in aggression on the part of Mr. Arabie—the levels, the Court finds, will only serve to confuse the jury and invite speculation about how those levels should be considered in determining whether a crime occurred. This is especially true when nothing that will be presented will tie that high level of toxicity to aggression. The Court sees it just as a risk of overdose and nothing else will tie it to that is my understanding.

I do find that witness testimony that Mr. Arabie was using methamphetamine throughout the day prior to the incident and that Mr. Arabie did in fact have this drug present in his bloodstream is admissible. The Court also finds that witnesses with specialized knowledge can testify about the general effects of methamphetamine use on behavior. But the levels—the Court simply does not find that they are relevant, and they will be, the Court finds, confusing.

Sendejo asserts that Arabie's level of intoxication "made the symptoms of his methamphetamine use . . . more apparent to Mr. Sendejo" and "the higher the level of drugs in Mr. Arabie's system, the higher the probability that he appeared violent, erratic, and irrational." The trial court asked defense counsel "what, if any, testimony is going to explain for the jury what these levels mean and how that reflects on your theory of it affecting . . . the defendant's fear based on these levels that were learned after the fact?" Defense counsel responded that the officers and toxicologist could testify about the general effects of drugs and changes in demeanor but could not "opine that Mr. Arabie engaged in any of those activities."

-18-

This was the exact type of speculation excluded in State v. Lewis, 141 Wn. App. 367, 166 P.3d 786 (2007). In Lewis, the defendant sought to include the testimony of an expert witness about the levels of methamphetamine in the victim's body. 141 Wn. App. at 386. The court reasoned that the medical examiner's testimony would not help the jury under ER 702 "[b]ecause of the wide range of effects of various quantities of methamphetamine on diverse individuals, and because [the medical examiner] had never observed [the victim] alive, with or without methamphetamine in his system, [the medical examiner] had no idea how the methamphetamine might have affected [the victim]." Lewis, 141 Wn. App. at 389. The court concluded, "this expert testimony would have been speculative and irrelevant to the issues the jury had to decide." Lewis, 141 Wn. App. at 389.

As in Lewis, any testimony that the exact levels of drugs in Arabie affected Sendejo's fear would be speculative. Further, if relevant at all, the evidence was only marginally relevant and posed a risk of confusing the issues for the jury to decide. Orn, 197 Wn.2d at 352.

We conclude that the trial court did not abuse its discretion in excluding the evidence as irrelevant and speculative.

B

Next, we examine de novo whether the ruling violated Sendejo's right to present a defense. Sendejo asserts that the trial court only permitted him to present an incomplete theory of defense and "only allowed Mr. Sendejo to elicit evidence concerning his personal observations of Mr. Arabie's consumption of methamphetamine and his belief that people on methamphetamine had super strength." He contends

-19-

"evidence that corroborated the fact that Mr. Arabie was indeed highly intoxicated would have strengthened Mr. Sendejo's theory of defense by highlighting the reasonableness of his use of force." The State argues that even if this court were to find that the excluded evidence was marginally relevant, Sendejo was able to argue his theory of the case and his constitutional rights were not violated. We agree with the State.

The proper test before this court is to balance the State's interest in excluding the evidence against the defendant's need for the information sought to be admitted. Arndt, 194 Wn.2d at 812. And in Arndt, the court determined that because the defendant was able to offer evidence in support of her defense theory without the excluded evidence, the defendant was not deprived of her Sixth Amendment right to present a defense. 194 Wn.2d at 814. So long as the "defendant has an opportunity to present his theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." State v. Ritchie, 24 Wn. App. 2d. 618, 635, 520 P.3d 1105 (2022).

Similar to this case, in Jennings, the defendant raised self-defense but was prohibited from introducing a toxicology report showing that the victim had methamphetamine in his system when the defendant shot him. 199 Wn.2d at 56. The defendant's self-defense argument was that he believed that the victim was high on methamphetamine and in his experience such individuals are erratic, aggressive, and violent. Jennings, 199 Wn.2d at 61. The court held that the trial court did not abuse its discretion by excluding the toxicology report under ER 403. Jennings, 199 Wn.2d at 63. The court reasoned that because the defendant did not know how the methamphetamine was affecting the victim and the defendant offered no witness to

testify as to the potential effects of methamphetamine on the victim, "the toxicology report was speculative and might confuse the jury." Jennings, 199 Wn.2d at 62-63.

The defendant argued that the "toxicology report was crucial because it corroborated his testimony regarding self-defense." Jennings, 199 Wn.2d at 66. Our Supreme Court held that since the defendant was "still able to testify regarding his subjective fear and belief that [the victim] was high," the toxicology report "merely bolster[ed] credibility," as opposed to being "necessary to present a defense." Jennings, 199 Wn.2d at 66-67. Thus, exclusion of the toxicology report did not violate the defendant's constitutional right to present a defense. Jennings, 199 Wn.2d at 67.

While Sendejo attempts to distinguish Jennings based on dissimilar facts, Jennings discussion about the second prong of the test is relevant to our analysis.

As in Jennings, the exclusion of the toxicology report did not violate Sendejo's constitutional right to present a defense because Sendejo was able to otherwise offer evidence to support his theory that he acted in self-defense. The trial court explained:

> I do find that witness testimony that Mr. Arabie was using methamphetamine throughout the day prior to the incident and that Mr. Arabie did in fact have this drug present in his bloodstream is admissible. The Court also finds that witnesses with specialized knowledge can testify about the general effects of methamphetamine use on behavior. But the levels—the Court simply does not find that they are relevant, and they will be, the Court finds, confusing.

And the witnesses were able to testify accordingly.

For instance, the medical examiner testified that Arabie tested positive for flubromazolam, a drug intended to calm someone down, amphetamine and methamphetamine, both of which are stimulants. The medical examiner explained that because these drugs have opposite effects, stimulants versus "downers," "if somebody

is overly stimulated, say from methamphetamine, and they want to come down, I imagine they would take the flubromazolam to decrease the level of anxiety or hyper-responsive that they feel."[14]

Officers testified that individuals high on methamphetamine can appear aggressive, erratic, and irrational. A forensic scientist testified that methamphetamine causes an "up phase" where it acts as a stimulant and the person is excited and a "down stage" where the person is extremely fatigued. The scientist explained that when someone uses multiple times a day, the effects will last much longer and they can experience "very intense exhilaration, excitation, euphoria" and "increased physical and mental power [which] can result in someone feeling like they can't lose." "[T]his also comes with rapid flight of ideas, poor judgment and poor impulse control."

The scientist testified that "binge use" leads to more negative side effects including "aggression, paranoia, delusions, hallucinations . . . [i]rrational behavior and violence." This witness also explained that a correlation exists between methamphetamine and violence when looking at violent deaths and the drugs that are involved.

And, while not conceding his argument, Sendejo's reply brief acknowledges that he was able to offer the preceding testimony. Thus, Sendejo was able to present evidence that Arabie was on drugs at the time of the incident and testimony on the effects of those drugs. The only piece he was prevented from offering were the exact levels of the drugs in Arabie's system.

---

[14] The forensic scientist with the Washington State Patrol Toxicology Lab testified similarly, explaining that Arabie was positive for amphetamine, flubromazolam, and methamphetamine, and that the drugs are stimulants and depressants.

The trial court excluded either irrelevant or minimally relevant evidence that would have merely added to other similar evidence. The evidence was only minimally relevant because the excluded evidence was cumulative of other evidence admitted at trial and, as such, Sendejo's ability to present his theory of the case was unimpaired by its exclusion. See Ritchie, 24 Wn. App. 2d at 635.

We conclude that the trial court properly excluded the toxicology report and that doing so did not violate Sendejo's right to present a defense.

IV

Sendejo argues that the trial court misapprehended the law when it rejected his request for a mitigated sentence. We disagree.

Although no defendant is entitled to an exceptional downward sentence, every defendant is entitled to ask the sentencing court to consider such a sentence and to have it actually considered. State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). In general, a party cannot appeal a sentence within the standard range. State v. Brown, 145 Wn. App. 62, 77, 184 P.3d 1284 (2008); RCW 9.94A.585(1). When the trial court imposes a standard range sentence over a party's request for an exceptional sentence, review is only permissible in "'circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.'" State v. McFarland, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (quoting State v. McGill, 112 Wn. App. 95, 100, 47 P.3d 173 (2002)). If reviewable, this court will only find that the trial court erred if it "'refuses categorically to impose an exceptional sentence below the standard range under any circumstances' or when it operates under the 'mistaken belief that it did not have the

-23-

discretion to impose a mitigated exceptional sentence for which a defendant may have been eligible.'" McFarland, 189 Wn.2d at 56 (quoting State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997); In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)). "[A] trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling." Garcia-Martinez, 88 Wn. App. at 330.

Here, Sendejo asserted that he was entitled to a mitigated sentence below the standard range based on RCW 9.94A.535(1)(a) and RCW 9.94A.535(1)(c). RCW 9.94A.535(1)(a) allows a trial court to consider a mitigated sentence when "[t]o a significant degree, the victim was an initiator, willing participant, aggressor, or provoker of the incident." RCW 9.94A.535(1)(c) allows for a mitigated sentence when "the defendant committed the crime under duress, coercion, threat or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct."

As the trial court imposed a standard range sentence, there need only be evidence in the record establishing that it exercised any discretion at all. Garcia-Martinez, 88 Wn. App. at 330. In announcing its sentence, the trial court explained:

> All right. So for the record, the Court has considered defense motion for an exceptional down as well as the defense pre-sentence report. The Court has also reviewed the State's sentencing memorandum as well as the State's sentencing report. The Court, I was the trial judge in this trial, so I heard the evidence that was put forward to the jury and was here when the jury rendered its verdict. With regard—the Court also is considered the speakers today, including Mr. Arabie's family as well as Mr. Sendejo.
>
> When the Court considers an exceptional down, in this case, based on the basis on which the exceptional down is being asked for, the Court's being

-24-

asked to consider mitigating factors. And there are a number of mitigating factors in this case, the character of where this occurred, when it occurred, during COVID, the fact it is true that it was stipulated that Mr. Arabie was the first aggressor in this case. And it's also clear to the Court that Mr. Sendejo believed that he was acting in self-defense. So the Court considers these factors.

However, I do not find that an exceptional sentence downward is appropriate in this case even considering those factors. The jury found that this was an intentional act. The jury found that this was not in self-defense. The evidence showed that Mr. Arabie was no longer a threat at the time that Mr. Sendejo stabbed him. And in the Court's mind, that is a threat to the public at large.

But I also do not find that the midpoint of the standard range sentence is appropriate either, and that is because the Court does consider the mitigating factors in this case and the lack of criminal history of Mr. Sendejo. So the Court considers those mitigating factors and finds that the low end of the standard range is appropriate with 24 months of a deadly weapons enhancement. So that means the total length of confinement is 147 months.

Sendejo asserts that the trial court's basis for denying the mitigated sentence was based on a clear misapprehension of the law. Sendejo's argument is based on the trial court's reference to the jury's determination. But before that reference, the trial court explained that it understood it was being asked to enter a mitigated sentence, considered the factors and evidence that would permit a mitigated sentence, and explicitly found it not appropriate. It is clear that the trial court considered the factors of RCW 9.94A.535(1)(a) and (c) that Sendejo presented and determined that was not sufficient to justify a mitigated sentence. But the trial court did find the low end of the standard range to be appropriate. This is sufficient to establish that the trial court exercised discretion. Garcia-Martinez, 88 Wn. App. at 330.

-25-

We conclude that the trial court did not mistakenly believe it lacked discretion to deviate from the standard range.[15]

V

Lastly, Sendejo argues that the $500 VPA and $100 DNA collection fee should be stricken from his judgment and sentence.

In 2023, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). LAWS OF 2023, ch. 449, § 1. In addition, the legislature eliminated the DNA fee entirely. LAWS OF 2023, ch. 449, § 4. Our courts have held that recent amendments to statutes governing legal financial obligations apply retroactively to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

The State does not dispute that Sendejo is indigent and concedes that this matter should be remanded to strike the VPA and DNA collection fee from Sendejo's judgment and sentence. We accept the State's concession and remand.

We remand to strike the VPA and DNA collection fee from Sendejo's judgment and sentence. We otherwise affirm.

---

[15] In a statement of additional authorities submitted after oral argument, Sendejo refers us to a recent unpublished opinion, State v. Kingma, No. 84487-3-I, slip op. at 29-31 (Wash. Ct. App. June 10, 2024), https://www.courts.wa.gov/opinions/pdf/844873.pdf, where we reversed because the trial court denied a request for a mitigated sentence based on the trial court's mistaken belief it did not have the discretion due to the jury's verdict. This nonbinding case is cited pursuant to GR 14.1(a) only because it is relied on by Sendejo. The trial court in Kingma explicitly stated, "[T]he jury has rejected your claim of defense of others. The jury has rejected your claim of self-defense. The jury has convicted you of three of the four counts. . . . [T]hat is their verdict, and I must sentence you accordingly to that verdict." Kingma, slip op. at 30-31 (most alterations in original). Here, the trial court did not mistakenly believe it lacked discretion due to the jury's verdict, the trial court noted it had discretion but based on the factors it considered chose not to exercise its discretion to grant a mitigated sentence.

_Mann, J._

WE CONCUR:

_Birk, J._                    _Dwyer, J._